IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RAYMOND ROMIG** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 8:21-cv-01475-PWG |
| | ) | |
| **MONTGOMERY COUNTY,** | **)** | **JURY TRIAL DEMANDED** |
| | ) | **INJUNCTIVE RELIEF** |
| Defendant. | **)** | **REQUESTED** |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Raymond Romig hereby submits this response to Defendant Montgomery County's (the "County's") Motion to Dismiss. In November 2019, the County seized 102 chickens from Romig's property based on allegations that Romig violated state animal cruelty laws. Romig challenges the decision by the Montgomery County's Animal Matters Hearing Board to impound his animals, deny his appeal of that decision, euthanize his chickens, and impose a $14,000 fine on Romig purportedly to pay for the upkeep and costs of the chickens. Romig brings three claims pursuant to section 1983 alleging violations of the Fourteenth and Eighth Amendments. The counts seek recovery for damages as well as declaratory and injunctive relief. For the reasons set forth below, Defendant's Motion to Dismiss should be denied and this case should be permitted to proceed to discovery.

## STATEMENT OF RELEVANT FACTS

### A.  The Initial Seizure of Romig's Animals

On November 18, 2019, Animal Services Officer Angel Ricketts was making a dog call north of Burtonsville, MD. Officer Ricketts spotted individual rooster cages on a neighboring property, a small farm located at 3801 Bell Road, Burtonsville, MD 20866. (Second Amend. Compl. ¶ 15). Romig, the property owner, agreed to show Ricketts around the property. (*Id*. ¶ 16). Two days later, Officer Ricketts executed a search warrant for Romig's property. (*Id*.).

 Officer Ricketts alleged that she had observed several factors which were evidence of raising chickens for breeding purposes which she claimed indicated animal cruelty. (*Id*. ¶ 20). Specifically, Officer Ricketts "observed many caged and uncaged birds on the property" and that "[t]he property appeared to be unkept" with "overgrowth and debris littered throughout the perimeter of the property." (*Id*. ¶ 24). She also "witnessed birds at the rear of the property without proper shelter" and "multiple single cage units on the property that house individual roosters which is indicative of the housing used in cock fighting establishments." (*Id*. ¶¶ 25, 35).

Officer Ricketts also made observations about the feedstock the birds had been given and the fact that wattles and combs on the birds were removed. She "observed multiple roosters with combs and wattles removed…". (*Id*. ¶ 27). Officer Ricketts claimed that removing combs and wattles "is a practice used only for cock fighting to protect the birds from injury when they are used in a fight.  There is no legitimate agricultural purpose for removing comb and wattles." (*Id*. ¶ 28). Officer Rickets further observed "multiple roosters and hens housed together in pens which is indicative of breeding establishments." (*Id*. ¶ 30). Finally, Officer Ricketts observed "multiple trash containers of high-quality feed on the property that Romig disclosed he mixes for his birds

which is a behavior indicative of a cock fighting/breeding establishment. Officers observed multiple bags of starter feed which is indicative of breeding establishments." (*Id*. ¶ 32).

Animal control officers claimed they had probable cause to seize  Romig's chickens. (Id. ¶ 35). On November 22, 2019, 102 chickens were seized. (*Id*. ¶ 37).

### B.  The Seizure was Based on Misleading Evidence

The evidence relied on by Officer Ricketts to seize the chickens had perfectly innocent and legitimate explanations that someone with knowledge of raising chickens would know. Multiple single-cage units are used by people raising roosters for reasons other than cockfighting.  As persons with expertise in the field of raising chickens understand, such caging is consistent with raising healthy chickens in most contexts, and that roosters are often separated because their natural instinct is to fight with each other if caged together. (*Id*. ¶ 25). The practice of removing combs and wattles, referred to as "dubbing," is actually required by both the American Poultry Association and the American Bantam Association in order for chickens to be shown at their sponsored events. (*Id*. ¶ 29). Dubbing is not a malicious practice but instead offers benefits to maintaining the health of roosters over the winter months. (*Id*.). The feedstock found on Romig's property is actually typical seen in the management high-end chicken breeds. (*Id*. ¶ 34). None of the feed ingredients found on Romig's farm are unique and none of them provide extra or special nutrition for cock fighting. (*Id*.).

### C.  The Executive Director and Animal Matters Hearing Board Decide to Impound the Chickens and the November 22, 2019 Letter

The County's Police Department, Animal Services Division ("the Department"), and the Animal Matters Hearing Board (the "Board") held a hearing and with the assistance of Director Thomas Koenig, approved the decision to keep 102 chickens seized from Romig. (*Id*. ¶ 42). In addition, the Board decided that the cost of housing the seized chickens was $14,000. (*Id*. ¶ 44).

The County sent a letter to Romig notifying him of the seizure of the chickens. (ECF No. 21-2,

Def.'s Ex. 2). The November 22, 2019 letter states:

> You are hereby notified that under Section 5-306 (a) of the Montgomery County Code, you have 5 days to appeal the Director's decision to indefinitely impound the animal(s) to the County's Animal Matters Hearing Board ["AMHB"]. The 5-day appeal period begins upon receipt of this letter. Enclosed is a copy of the Hearing Application Form (the appeal form), which provides instructions for filing.
>
> If you appeal the impoundment of your animal(s) to the Board, you must make payment in full, in the amount listed below [$14,000] , no later than 5 pm on November 27, 2019, to pre-pay the boarding costs for the period between November 21, 2019 and December 21, 2019. Unless you appeal the Director's determination of boarding costs (as listed below) to the County's CAO (Chief Administrative Officer) within five days after this letter is mailed or given to you, your failure to make such payment by the designated date and time will result in your animal(s) being deemed abandoned and becoming the property of Montgomery Count.
>
> If, by the close of business on November 27, 2019, you have not made your first monthly prepayment of boarding costs, you have not filed an appeal to the [AMHB] challenging the impoundment decision, and you have not filed an appeal to the County's Chief Administrative Officer seeking review of the Director's determination of boarding costs, then all of your animals (described above) will be considered abandoned, and will become the property of Montgomery County.

(*Id*.).

An arrest warrant for Romig issued on November 26, 2019, and it was executed on

December 2, 2020. *See* District Court for Montgomery County, Case No. 2D00405092. Romig

turned himself in and was charged with ten counts of violating Maryland Criminal Code 10-606

(aggravated cruelty to animals) and ten counts of 10-608 (animal cruelty, cockfighting). In

addition, he was charged with one count of 10-608 (possessing instruments of cockfighting) and

one count under the common law of possessing instruments of cockfighting. (ECF No. 17, Second

Amend. Compl. ¶ 37).

### D.  The Board Rejects Romig's Appeal of the Decision

Romig filed an appeal on December 9, 2019, eighteen days after the chickens were seized. (*Id*. ¶ 45). He appealed the decision of the Department and the Board. The appeal was sent to the Department and to Director Koenig. (*Id*. ¶ 46). Romig appealed the Department's and Director Koenig's decision to seize 102 chickens and the determination by the Board that the cost of housing the chickens was $14,000; Romig sought a waiver of the cost of care. (*Id*.).

In a December 16, 2019, email, the Department and Board informed Romig's counsel that the Board received Romig's appeal, but would not accept it was not received within five days of the Department's November 22, 2019 letter. The Department also noted that it would not process Romig's appeal because the application fee of $25.00 was not remitted.

Romig argued there were two reasons why the Board should not have denied his appeal. First, there is no statutory or regulatory authority the mandates the appropriate sanction a late-filed notice of appeal is to refuse to address the merits of an appeal in its entirety. Instead, Maryland Rule 7-207(d), which addresses sanctions for late filing of briefs, requires that a court examine if the late filing prejudiced the opposing party. Second, Montgomery County Code § 5-306(a), which requires appeal to the Board be done within five days, notes an exception, § 5-104(a)(3) states, "The Board must not hear a complaint or an appeal involving seizure of an animal if the owner has been arrested and charged with violating any provision of Title 10, Subtitle 6 of the Criminal Law Article." (*Id.*).

When Romig received the November 22, 2019, letter, or shortly thereafter, he was unrepresented by counsel and was charged with multiple felony criminal counts. Out of a concern not to waive his Fifth Amendment rights, Romig was unable to review and understand his rights in a timely manner. On January 16, 2020, the Board issued a decision that denied the appeal as

untimely filed.  On January 21, 2020, Romig filed a Request for Judicial Review with the Circuit Court of Montgomery County, which was finally denied on November 12, 2021. Romig requested the court to reverse the Department and the Board's decision to confiscate the chickens and to order their return. (ECF No. 17, Second Amend. Comp. ¶ 47). Second, pursuant to MD Rule 7-205, Romig requested that the court bar the Department and the Board from taking any action that would harm Romig's chickens until after a hearing on the merits of the case. (*Id*. ¶ 48).

### E.  The Board Starves and Euthanizes the Chickens

The chickens were in demonstrably good health at the time they were seized from Romig. (*Id*. ¶ 38). Once seized, the chickens were under the care and control of the Department and the Board. (*Id*. ¶ 40). On November 22, 2019, Director Koenig sent a letter to Romig stating, "[w]hile your animal(s) is in protective custody with ASD, [Animal Services Division] during any appeal process prior to a Board decision, the animal(s) will NOT be euthanized, unless medically necessary." (*Id*. ¶ 41).

Sometime in December or January of 2020, while in the County's care, almost all of the chickens seized from Romig died from starvation or euthanasia. (*Id*. ¶ 50). The health of the chickens deteriorated rapidly due to mistreatment while in the Board's care and control. (*Id*. ¶ 52).

At the sentencing hearing in the criminal case, the Montgomery County States Attorney's Office conceded, upon questioning by the presiding judge, that the decision was made to euthanize the animals for financial, rather than medical reasons. (*Id*. ¶ 54). Some of the chickens "had to [be] euthanize[d] because they were unable to pay and care for those particular animals." State v. Romig, Criminal No. 136875C, Plea Hearing and Sentencing Transcript, p. 30.  (*Id*.). According to the Final Laboratory Report of the Frederick Animal Health Laboratory, January 9, 2020, p. 2, the seized chickens' "[s]uspected cause of death is starvation." (*Id*. ¶ 53).

### F. Twenty-one of the Counts Against Romig are Dismissed

Romig entered a plea agreement and was found guilty on one count under § 10-608 (possessing instruments of cockfighting). (*Id*. ¶ 55.) *See also State of Maryland v. Raymond Romig*, Case No. 136875C). As part of his plea agreement, on October 26, 2020, Romig agreed not to own any roosters for two years, or until October 26, 2022. (ECF No. 21-_ at 4 – 5, 7, 32 –33, Transcript of Plea Hearing and Sentencing). Of the twenty-two counts he was charged with, Romig pled not guilty to twenty-one counts. The charges were dismissed as to those twenty-one counts on October 26, 2020.

### STANDARD OF REVIEW

When deciding a Rule 12(b)(6) Motion, the Court must accept as true all factual allegations in the complaint, "[t]he factual allegations in the complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). A Rule 12(b)(6) dismissal motion tests the sufficiency of a complaint, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court "must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level." *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009).

## ARGUMENT AND CITATION TO AUTHORITY

**I.     Romig has Standing to Pursue his Claim**

To establish standing a plaintiff must demonstrate that: (1) he has suffered an "injury in fact" that is concrete, particularized, and actual or imminent, (2) the injury is "fairly traceable" to the defendant's conduct, and (3) the injury can be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The "injury in fact" requirement is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief. *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). To seek prospective relief, the plaintiff must suffer a continuing injury or be under a real and immediate threat of being injured in the future. *Id*. Although a past injury does not provide standing to seek prospective injunctive relief "[a]bsent a sufficient likelihood that [the plaintiff] will again be wronged in a similar way." *Id*. A plaintiff seeking retrospective relief, on the other hand, satisfies the "injury in fact" requirement if she suffered a past injury that is concrete and particularized. *Lujan*, 504 U.S. at 560-61.

Here, Romig alleges an injury in fact for retrospective relief against the County. Romig alleges that the seizure of his animals, carried out by the County in accordance with Maryland and Montgomery County statutes and regulations, violated his right to procedural due process under the Fourteenth and Eighth Amendment because the statutes failed to place him on notice of what conduct is prohibited and the County failed to provide Romig with a hearing before his animals were euthanized. *See Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (finding plaintiff had standing to bring Fourteenth Amendment due process claim after state official reclassified plaintiff as sex offender); *see United States v. $38,000.00 in U.S. Currency*,

816 F.2d 1538, 1544 (11th Cir.1987) (ownership of property that has been seized can be evidence of the existence of an injury that is direct enough to confer standing).

Romig also has standing to seek prospective relief. First, a plaintiff generally has standing if he or she alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *People for the Ethical Treatment of Animals, Inc. v. Stein*, 737 F. App'x 122, 129 (4th Cir. 2018) (same). Plaintiffs may have standing even if they have never been prosecuted or actively threatened with prosecution. *Doe v. Bolton*, 410 U.S. 179, 188 (1973). Second, although allegations of a "subjective" chill are not adequate, *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972), a plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the "objectively reasonable chilling effect" on the exercise of his rights. *People for the Ethical Treatment of Animals, Inc. v. Stein*, 737 F. App'x at 129 (recognizing an injury in the First Amendment context). A credible threat of enforcement exists when a plaintiff has been previously arrested or prosecuted. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164, (2014).  For a plaintiff who is subjected to a credible threat of enforcement, it is not necessary that he expose himself to actual arrest or prosecution again in order to challenge the law. *Id*. at 158.

While the challenge brought in *People for the Ethical Treatment of Animals, Inc. v. Stein* and *Susan B. Anthony List* implicated the First Amendment right of free expression, many pre-enforcement challenges have also presented a due process interest in avoiding vague criminal prohibitions. *See*, *e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7, 10-11, 18-25, (2010); *Babbitt*, 442 U.S. at 295–296; *Ellis v. Dyson*, 421 U.S. 426, 430, 433–35 (1975). The Court has

drawn no distinction between these constitutional interests in pronouncing a credible threat of prosecution sufficient to establish standing.

Romig's complaint sufficiently alleges an injury-in-fact for purposes of his Fourteenth Amendment challenge. Romig intends to own birds again in the future. (ECF No. 17, Second Amend. Compl. ¶ 62). He has alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest," however, there is a credible threat that the statutes will be enforced against him if he proceeds with he plans, and, for the moment, he has refrained from proceeding for fear of being subjected to either having his animals seized and impounded again or facing criminal prosecution.

With respect to the chilling effect of the statute, Defendant may argue that Romig's injury is "self-inflicted" because he is currently choosing to not own birds to comply with the terms of his plea agreement. Romig cannot manufacture standing merely by inflicting harm on himself because such conduct cannot be deemed fairly traceable to the Defendant. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418, n.5 (2013). Standing exists, however, if a plaintiff faces a "substantial risk" that the harm will occur and this causes a plaintiff to reasonably incur costs to mitigate or avoid that harm. *Id*; *see Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 804 (9th Cir. 2020) (a criminal defendant's decision to remain in state custody by not posting bail is not "self-inflicted" but directly linked to and caused by challenged state enforcement action).

Romig's decision to take a plea deal was taken to avoid jail time from prosecution for owning birds that may fall within the definition of Maryland animal cruelty statutes and this was caused by Defendant's enforcement of Montgomery County Code § 5-301 *et seq*;. *See id*.; (ECF No. 17 ¶ 55.); (ECF No. 21-2 at 4 – 5, 7, 32 –33, Transcript of Plea Hearing and Sentencing). Far from being self-inflicted, the decision is directly linked to and caused by Defendant's enforcement

of the animal cruelty laws would lead to additional either impoundment of his animals or jail time. *See . Clapper*, 568 U.S. at 418, n.5; *Gonzalez*, 975 F.3d at 804.

Finally, Romig alleges an injury in fact for prospective relief against the County because he suffers a continuing violation, his prohibition on owning animals. *See Spencer v. Kemna*, 523 U.S. 1, 7-8 (1998); *see Sibron v. New York*, 392 U.S. 40, 55–56 (1968). In criminal cases, a party has standing sufficient to satisfy Article III when a defendant suffers a continuing violation or a collateral consequence stemming from his conviction. *Id*. *Spencer*, 523 U.S. at 7-8. Such "civil disabilities" might include subjection to laws that restrict certain trades and licenses, to laws that bar service as a public official or on a jury, that disfranchise a felon from voting, or that bar service in the armed forces. *Carafas v. LaVallee*, 391 U.S. 234, 237 (1968). Here, Romig suffers from a prohibition on his owning animals in the future and therefore he suffers a continuing injury and consequence stemming from the County's enforcement actions. (ECF No. 17 ⁋ 55.); (ECF No. 21-2 at 4 – 5, 7, 32 –33, Transcript of Plea Hearing and Sentencing).

## II.    Plaintiff Successfully Establishes a *Monell* Claim for Municipal Liability

To prevail on a § 1983 claim, a plaintiff must show that (1) he was deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). A *Monell* analysis focuses the liability of a municipality for a constitutional violation.

Municipal liability for a deprivation of a constitutional right will only attach in cases where the municipality causes the deprivation "through an official policy or custom." *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). A policy or custom for which a municipality may be held liable can arise in several ways: (1) through an express unconstitutional ordinance or policy; (2) through the decisions of a person with final policymaking

11

authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle*, 326 F.3d at 471. Official policy also exists when there are actions by municipal agencies or boards that exercise authority delegated by the municipal legislative body. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). In *Monell*, for example, the plaintiffs challenged regulations adopted by the Department of Social Services and the Board of Education requiring pregnant employees to take unpaid leaves of absence. *Id*. at 661. The Court found that the actions of such agencies "unquestionably involve[] official policy." *Id*. at 694.

In addition, a plaintiff must identify a final policymaker who possesses "final authority to establish municipal policy with respect to the action ordered." *Hunter v. Town of Mocksville*, N. Carolina, 897 F.3d 538, 554 (4th Cir. 2018), 355 F.3d 766, 782 (4th Cir. 2004). To be a final policymaker, a final policymaker does not merely operate discretionary authority or go along "with the discretionary decisions made by one's subordinates. *Id*. (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). Similarly, an official is not a final policymaker if his decision is subject to review by the municipality's authorized policymakers. *Id*. (citing Praprotnik, 485 U.S. at 127). Finally, courts determine whether an official has sufficient policymaking authority by looking to state law. *Id*. (citing *Praprotnik*, 485 U.S. at 124).

The Board's decisions to impound or destroy animals are official policies. MC Code § 5-301 *et seq*; *see Monell*, 436 U.S. at 691. The Board is delegated authority by the County to exercise authority over the impoundment and destruction of animals. The Board is authorized by County regulations to enforce animal control laws by issuing written orders. MC Code § 5-301 (a)-(b). The Board has the authority to order the Executive Director to either destroy or not destroy an

12

animal or to take some other action. *Id*. (c)(2), (h). The Board also has the authority to review the decisions of the Executive Director or to deny appeals of a decision. MC Code § 5-306. The decisions of the Board are not otherwise reviewable except for recourse to judicial review. MC Code § 5-307. The Board therefore has final policymaking authority. *See Monell*, 436 U.S. at 691.

Romig's *Monell* claim is distinguished from *Walker v. Prince George's Cty., MD*, 575 F.3d 426, 431 (4th Cir. 2009). In *Walker*, the plaintiff failed to adequately state a *Monell* claim when he pointed to testimony from an animal control officer regarding the seizure of an exotic animal. *Id*. In relying on the testimony of a line officer instead of identifying a final policymaker for the defendant municipality, the *Walker* plaintiff failed to identify decisions that constitute an official policy or custom. *Id*.

### III.  Plaintiff Succeeds on a Due Process Claim under the Fourteenth Amendment (Counts I and II)

Romig successfully states a due process claim. Romig brings facial and as-applied challenges to the statutes because they violate the Fourteenth Amendment right to due process.

#### A.  Standard of Law for Facial and As-Applied Challenges to Statutes

A constitutional challenge to the validity of a statute can be brought in one of two ways: either by a facial challenge or via an as-applied challenge. A facial challenge asserts that a statute is invalid as written when measured against a substantive constitutional doctrine, rather than against the facts of a particular case. *See City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015). An as-applied challenge seeks to prevent a statute's future application in a similar context. *Ada v. Guam Soc'y. of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012 (1992) (Scalia, J., dissenting). The distinction between them is not so well-defined as to have some automatic effect. *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 893 (2010). Challenges to a statute's

constitutionality can have characteristics of both classifications. *Doe v. Reed*, 130 S. Ct. 2811, 2816 (2010).

It is a myth that facial challenges to statutes are disfavored. The Court's rhetoric has expressed this before. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). But the Court acknowledged that the Court's actual practice reveals that facial challenges are not disfavored. *Patel*, 576 U.S. at 415 (acknowledging that in a survey of six Supreme Court Terms the Court adjudicated more facial challenges on the merits than it did as-applied challenges) (citing FALLON, Fact and Fiction About Facial Challenges, 99 CAL. L.REV. 915, 918 (2011)).

Nor does a facial challenge to a statute have to be facially unenforceable in all of its decision. Prior to 2015, a statute confronting a facial challenge had to be facially unenforceable in all of its applications for it to be invalid. *Johnson v. United States*, 576 U.S. 591, 636 (2015) (Alito, J., dissenting). But in *Johnson* Justice Scalia found a provision of a federal statute to be facially unenforceable even if some conduct clearly fell within the statute's provisions. *Id*. at 601-02. Nonetheless, even when assessing whether a statute meets the "unconstitutional in all of its applications" standard, a reviewing court does not consider the entire range of the statute's application, but only considers applications of the statute whereby it actually authorizes or prohibits conduct. *Patel*, 576 U.S. at 418.

Finally, due process is a flexible concept that varies with the particular situation. In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Court provided three factors to determine what procedural protections the Constitution requires in a particular case: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest. As to the first *Mathews* factor, it is clear that parties have a protected property interest in their animals. *See Porter v. DiBlasio*, 93 F.3d 301, 305 (7th

14

Cir. 1996) ("The parties do not dispute, and we certainly agree, that [Plaintiff's] ownership interest in the nine horses is a protected property interest under the Fourteenth Amendment."). It is also clear that under the third *Mathews* factor the state has a strong interest in protecting against the inhumane treatment of animals. *Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009). Here, the legal question turns to the second *Mathews* factor, whether Montgomery County Code § 5-301 *rt seq* provides enough procedural safeguards to comply with the Fourteenth Amendment.

### B.   Montgomery County Code § 5-301 *et seq* Fails to Provide Sufficient Procedural Safeguards to Comply with the Fourteenth Amendment.

Montgomery County Code § 5-301 *et seq* permits an animal control officer to seize animals in order to enforce animal cruelty laws. The statute fails to provide sufficient Fourteenth Amendment safeguards because (1) the statute does not offer a pre-deprivation hearing and (2) the post-deprivation remedies offered are insufficient.

### 1.   Montgomery County Code § 5-301(c)(1) Fails to Offer a Pre-Deprivation Hearing

The principal reason Montgomery County Code § 5-301*et seq* is unconstitutional is that it fails to offer a pre-deprivation hearing. While § 5-301(c)(1) requires that officials inform owners of a decision to seize an owner's animals, the provision provides no opportunity for owners to challenge that decision before the seizure occurs.

The Supreme Court has consistently held that pre-deprivation process is the "root requirement" of the Due Process Clause. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). The essence of due process is the requirement that "a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S., at 171-172 (Frankfurter, J., concurring). The Court noted that the "practice of ex parte seizure creates an unacceptable risk of error" of depriving someone of their rights. *James Daniel*

*Good Real Prop.*, 510 U.S. at 55. In *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972), the Supreme Court stated: "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." Even a temporary seizure of animals does not alter the need for due process because even "a temporary non-final deprivation of property is nonetheless a 'deprivation' in terms of the Fourteenth Amendment." *Id*. at 84–85. "The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property." *Id.* Therefore, the lack of a pre-seizure hearing is the exception, not the rule, and the County must demonstrate why it is entitled to that exception.

The judicial model of an evidentiary hearing is not required in all circumstances. *Eldridge*, 424 U.S. at 349. The Court has cautioned that what is necessary is that the procedures be tailored, in light of the decision to be made, to "the capacities and circumstances of those who are to be heard," to ensure that they are given a meaningful opportunity to present their case. *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). In *Mathews*, a full judicial evidentiary hearing was not required when the prescribed procedures provided the claimant with an effective process for asserting his claim prior to any administrative action and recourse to a full judicial hearing was provided afterward. 424 U.S. at 349. The plaintiff in *Mathews*, a claimant disputing the denial of his social security benefits, had the opportunity to challenge the denial in a written response prior to losing his benefits. *Id*.

The Court has extended the reasoning of *Mathews* and clarified that unless exigent circumstances are present the Due Process Clause requires government to afford notice and meaningful opportunity to be heard before seizing property even in civil forfeitures. U*nited States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993). In *James Daniel Good Real Property*, the Government's legitimate interests at the inception of a forfeiture proceeding were preventing

16

property from being absconded, sold, destroyed, or used for further illegal activity. *Id*. at 58-59. The Court noted that the property could be secured through measures less intrusive than seizure such as a restraining order to prevent the destruction of property and search and arrest warrants to forestall illegal activity. *Id*.

Here, § 5-301(c)(1) provides no opportunity for an owner to contest a decision to seize his animals before the seizure occurs. While the seizure is carried out by an animal welfare officer, the animal welfare officer is not required to consult a veterinarian, nor was the animal welfare officer, in this case, trained to care for birds. Further, unlike the written response the plaintiff was entitled to in *Mathews*, here Romig had no meaningful pre-seizure opportunity to contest the serious loss he suffered. *See Mathews*, 424 U.S. at 349.

Similarly, less intrusive means, such as a restraining order, were available to prevent the sale or destruction of animals. See *James Daniel Good Real Property*, 510 U.S. at 58-59. While animals are not as immovable as real property, it is still obviously difficult to move dozens or hundreds of animals and thus there is a low risk of animals being absconded. *See id*. Finally, like in *James Daniel Good Real Property*, because a claimant is already entitled to a hearing before a final judgment, requiring the local governments to postpone seizure until after an adversary hearing creates no significant administrative burden compared to the harm brought about by erroneous seizure. *Id*. at 59.

### 2. Montgomery County Code § 5-301 Fails to Offer Sufficient Post-Deprivation Remedies

In addition to the lack of a pre-deprivation hearing, other factors favor finding that the risk of an erroneous deprivation of an animal owner's rights is high: (1) the statute's provisions, § 5-301(c) and § 5-303(c)**,** only permit an animal owner five days to appeal a decision by the Board; (2) the statute imposes a surety bond which cannot be meaningfully challenged; (3) owners cannot

direct the care and feed of their animals pending a final forfeiture decision; and, (4) the statute limits the right of owners to appeal a forfeiture decision.

### i. The Short Time for Notice, only Five Days, does not Permit an Animal Owner a Meaningful Opportunity to be Heard on a Matter or to Seek a Waiver of the Bond Imposed for Caring for the Animals

The failure of an administrative official or board to give a proper notice of a hearing, including time to intelligently prepare for a hearing, prevents the official or board from conducting a valid hearing. *Cassidy v. County Board of Appeals*, 218 Md. 418, 421–22, 146 A.2d 896 (1958). The essence of due process is the requirement that the party be given "notice of the case against him and opportunity to meet it." *Mathews*, 424 U.S. at 348–49. Due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner" to present their case. *Id.* at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

> [T]he heart of the requirement of notification in administrative proceedings [is that] the noticee should be apprised clearly of the character of the action proposed and enough of the basis upon which it rests to enable him intelligently to prepare for the hearing. If this minimum requirement is met, the notification is adequate, no matter how much it may fall short of the standards of pleading in judicial contests.

*Cassidy*, 218 Md. at 421–22.

Montgomery County Code § 5-301(c), § 5-306 state that after an animal owner is notified of an action under § 5-301(c), the animal owner only has five days to request a hearing or, under § 5-303(b), request a waiver of any boarding or impoundment fee. This time frame does not permit an animal owner a meaningful opportunity to review and become appraised of his rights, to seek legal counsel, or to prepare for a hearing. Given that this short time frame fails to provide an animal owner with sufficient notice to intelligently prepare for a hearing, the notification is not adequate and the statute does not provide sufficient due process to animal owners, such as Romig. *See Cassidy v. County Board of Appeals*, 218 Md. 418, 421–22, 146 A.2d 896 (1958); *Mathews*, 424

U.S. at 348–49. This is especially true where, as here, Romig was unrepresented by counsel at the time and potentially facing numerous felony charges and therefore was afraid to participate further in the administrative process for fear of waiving his Fifth Amendment right to not incriminate himself.

> ### ii. The Statute Imposes Costs for Boarding Impounded Animals which cannot be Meaningfully Challenged

In *Humane Soc. of Marshall County v. Adams*, 439 So.2d 150, 153 (Ala. 1983), the Supreme Court of Alabama held that Alabama's animal neglect law was unconstitutional because, among other factors, animal owners became liable for any expenses for the animal's care. The Alabama court noted that owners did not have an opportunity to challenge the amount imposed for the animals' care, stating: "[i]n addition to the deprivation of the owner's interest in his animals, he becomes liable for any expenses for their care, the amount of which expenses being solely controlled by the Society." *Id*.

Here, Montgomery County Code § 5-301(c)(1) provides that an animal owner must prepay any boarding costs before and during an appeal within five days. While § 5-301(c)(7) does permit an animal owner to seek a waiver or modification of the boarding costs, the requirement that an animal owner seek modification within five days of giving notice means the statute does not provide parties with any meaningful opportunity to contest the costs. *See id*. In Romig's case, the Board decided that the cost of housing the seized chickens was $14,000. (ECF No. 17, Second Amend. Compl. ¶ 44). The Board's decision required that Romig pay for the cost of housing the seized chickens in an amount that Romig was unable to pay. (¶ 46).

> ### iii. Montgomery County Code § 5-301 *et seq* Limits the Right of Owners to Direct the Care and Feeding of their Animals

Further, the statute fails to provide animal owners the opportunity to give instructions regarding the type of care and nourishment an animal will receive while in a locality's custody. *See* MC § 5-301 *et seq*. In the course of finding an animal seizure statute unconstitutional in *Com. v. Gonzalez*, 403 Pa. Super. 157, 173 588 A.2d 528 (1991), a Pennsylvania state court noted one factor was: "The statute does not provide the owner of the animal the opportunity to assure that the animals receive the proper care pending the outcome of the criminal trial." *Id*. Providing specific instructions for the care of animals is a point of concern for animal owners generally; but it is especially concerning in this case where, sometime in December 2019 or January of 2020, Romig's chickens died while in Defendant's care from starvation and euthanasia. (ECF No. 17, Second Amend. Compl. ¶¶ 50, 53). As noted above, the chickens were in demonstrably good health when seized. (*Id*. ⁋ 51).

### iv.   Montgomery County Code § 5-301 *et seq* Limits the Right of Owners to Direct the Care and Feeding of their Animals

Due process does not require a state to provide an appeal. *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). However, in *Griffin*, which marks the start of a series of cases enforcing equal access to courts, the Supreme Court held that once a state decides to grant appellate rights, it may not do so in a way that is unequal on the basis of poverty. *Id*. at 18. Whether a statute provides for a meaningful appeal is one factor a court considers when examining whether a statute provides adequate procedural safeguards. *See e.g., Dr. Allan L. Bergano, D.D.S., P.C. v. City of Virginia Beach*, 241 F. Supp. 3d 690, 704 (E.D. Va. 2017) (finding that a plaintiff was denied due process when he was not informed of his right to appeal under a federal regulation). Due process requires a fair trial, and the guarantee of a fair trial is protected through the appeals process. *See Jones v. Barnes*, 463 U.S. 745, 757 (1983) (Brennan, J., dissenting) ("There are few, if any, situations in

our system of justice in which a single judge is given unreviewable discretion over matters concerning a person's liberty or property.").

Here, the statute fails to provide a meaningful opportunity to appeal because the Director may require an animal owner prepay any boarding costs before and during any appeal to the Board. MC Code § 5-303(c)(1) ("The animal's owner must prepay any boarding costs before and during any appeal to the Board). While the animal owner is permitted to seek a waiver of this fee, again that is subject to the same five-day time frame discussed above. *Id*.

### v.    Montgomery County Code § 5-301 *et seq* Fails to Offer a Separate Hearing before Animals are Destroyed

The failure to provide a separate hearing before animals are destroyed also creates a high risk that an animal owner will be permanently deprived of his rights. *See Gonzalez*, 403 Pa. Super. at 174. The lack of a meaningful opportunity to appeal an order to impound the animals, the lack of an independent hearing in regard to the destruction of animals, the lack of a showing which a veterinarian must meet, and the inability to cross examine a veterinarian or other official's determination that animals must be destroyed were all contributing factors to a court striking down a Pennsylvania animal seizure statute. *Id*. In *Gonzalez*, the state analogized the situation to cases involving the confiscation of contraband, such as narcotics and weapons, and the subsequent forfeiture of such property following conviction. *Id*. at 174-75. But the court disagreed "that simply because an individual may subsequently be required to forfeit ownership of the animal, the state may prematurely destroy the animals without providing the owner with the opportunity to voice opposition to the proposed destruction." *Id*. at 174-75. In *Gonzalez,* the court concluded that "the statute offers absolutely no procedural protections against the arbitrary encroachment of an animal owner's property rights." *Id*. at 174.

Here, the statute permits the destruction of seized animals by euthanasia without a procedural check. § 5-306(a). Romig filed his appeal to the Board after the five day window had expired but was not then offered any further hearing to preserve his animals before they were destroyed. While the Executive Director or an animal control officer may not dispose of the animal during the 5-day period for filing an appeal, or while an appeal is pending, there is no other hearing requirement or procedural check before the County disposes of the animal. § 5-306(a). Further, the statute does not require that a veterinarian demonstrate that the animal's health has deteriorated and that destroying the animal is necessary. *See id*. There is no independent hearing to challenge the decision to destroy the animals. *See id*.

The possibility that impounded animals may be euthanized is not hypothetical. (ECF No. 17, Second Amend. Compl. ¶¶ 50, 53). The lack of any independent hearing is especially concerning given that the County will euthanize animals for non-medical reasons. *See* (*Id*. ¶ 54). At the sentencing hearing in the criminal case, the Montgomery County States Attorney's Office conceded, upon questioning by the presiding judge, that the decision was made to euthanize Romig's animals for financial, rather than medical reasons. (*Id*.). Some of the chickens "had to [be] euthanize[d] because they were unable to pay and care for those particular animals." *State v. Romig*, Criminal No. 136875C, Plea Hearing and Sentencing Transcript, p. 30. (*Id*.).

## IV. The Definition of Cruelty Renders the Statutes Unconstitutionally Vague

Maryland Criminal Code § 10-606 prohibits aggravated cruelty to animals. Section 10-608 also prohibits animal cruelty to animals and specifically prohibits possessing instruments of cockfighting. Maryland Criminal Code § 10-615(b)(1) permits an officer or other public official to seize an animal if necessary to protect the animal from cruelty. These statutes both refer to and rely on the definition of cruelty contained in Maryland Criminal Code § 10-601. Montgomery

County Code § 5-201 also clearly refers to the State criminal codes and provides that "[a] person must not violate State laws against cruelty to animals, such as (1) violating general prohibitions against cruelty (Md. Code, Criminal Law Article Title 10, Subtitle 6) and "aggravated cruelty to animals, in general." "Cruelty" is defined as "the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect." Md. Code § 10-601.

Romig challenges these statutes on the basis that cruelty is not sufficiently defined in the statute; Romig does not challenge the statutes on the basis that game cockfighting is unconstitutionally vague. Officer Ricketts seized Romig's animals on both bases, that she suspected gamecock fighting and that she suspected "cruelty" to the chickens; for example, Officer Rickets suspected that the manner in which Romig was breeding chickens constituted animal cruelty. *See* (ECF No. 17 Second Amend. Compl. ⁋ 30) ("Officer Rickets further observed "multiple roosters and hens housed together in pens which is indicative of breeding establishments.").

The void-for-vagueness doctrine is a basic principle of due process and holds "that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The void-for-vagueness doctrine is applicable to cases that involve civil penalties and not just criminal liability. *See e.g*., *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc*., 556 U.S. 502 (2009) (finding that the FCC violated the due process rights of broadcasters when it fined broadcasters for instances of brief nudity or expletives when the FCC reversed a long-standing policy without giving fair notice). A statute may be unconstitutionally vague for two independent reasons: (1) "it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits;" or (2) "it may authorize and even

encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

The fair notice requirement is governed by an objective standard. *Grayned*, 408 U.S. at 108. The fair notice requirement is met if the law "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Id*. at 108-09; *see United States v. Lanier*, 520 U.S. 259, 266 (1997). But the second prong is the most important— concern for arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting Smith v. Goguen, 415 U.S. 566, 574 (1974)). "[A] legislature [must] establish minimal guidelines to govern law enforcement.'" *Id*. Further, a statute can be facially void for vagueness even if it is not vague in all applications. *Johnson v. United States*, 576 U.S. 591, 602 (2015).

The Supreme Court has struck down criminal statutes that imposed culpability when the defendants' conduct was "annoying" or "indecent"— these words were subjective judgments not defined or narrowed by the statute and without legal meanings. *See Coates*, 402 U.S. at 614; *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870-871 (1997*). See also Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553 (6th Cir. 1999) (holding that provision of ordinance "or as determined by the inspecting officer to be a reasonable radius," was unconstitutionally vague because it provided the inspector with limitless discretion). For example, in *Folkers*, 2007 WL 3430936, at *11, a challenged statute defined "dangerous dog" as "[a]ny dog declared to be dangerous by the city council or an animal control officer." This definition left enforcement of the statute to the unfettered discretion of a government agent because the definition was hopelessly circular. *Id*. The court held that "this circular definition does not provide any guidance to the public and is unconstitutionally vague." *Id*.

24

Md. Code § 10-601's definition of animal cruelty, which the State animal cruelty and Montgomery County Code refer to, is unconstitutionally vague because it sets no standard against which a judge can assess an animal's conditions when ruling on a warrant to be issued or when determining whether an officer enforcing a state animal cruelty law may seize an animal.  Md. Code § 10-601; *Morales*, 527 U.S. at 56. Because the phrase "the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect" is unclear as to what omissions or neglect is unnecessary, it gives an unrestricted delegation of power to law enforcement officers to define in their minds whether conduct violates the statute. *See Morales*, 527 U.S. at 56. For example, whether housing chickens in multiple roosters and hens together in pens or whether removing wattles and combs from chickens is "unnecessary" pain or suffering is left to the subjective determination of an animal control officer who has no training in working with birds. *See* (ECF No. 17, ¶¶ 23, 27, 28, 30). The phrase is unlimited and undefined by the statute, thereby leaving police and courts free to seize animals from their owners. *See* Md. Code § 10-601; *Morales*, 527 U.S. at 56.; *Folkers*, 2007 WL 3430936, at *11.

**V.    Plaintiff Successfully States An Eighth Amendment Claim (Count III)**

Romig also challenges the statute under the Eighth Amendment's Excessive Fines Clause. The Eighth Amendment limits the ability of state or federal governments to impose payments, whether in cash or in kind, as punishment for some offense. *Timbs v. Indiana*, 139 S. Ct. 682, 687, 203 L. Ed. 2d 11 (2019). The clause has been applied to encompass the entire burden imposed through punishment, including the collateral consequences of a conviction or forfeiture. *See id*. While the Excessive Fines clause was previously limited to criminal cases, the Court held that in rem civil forfeiture proceedings fall within the scope of the Eighth Amendment. *See Austin v. United States*, 509 U.S. 602, 610 (1993). In *Austin*, the Court held that a forfeiture, civil or

criminal, may be characterized as a fine for Eighth Amendment purposes if it serves, even in part, to punish the property owner for an offense that has been committed. *Id.*

To determine whether a payment violated the Excessive Fines Clause, the first issue is whether a payment is a "fine." The second issue is whether the fine is excessive.

### A. The Costs Imposed on Romig to Pay for the Upkeep of his Chickens are Fines Within the Meaning of the Excessive Fines Clause.

The bond imposed by the court is explicitly for the purpose of defraying the the County's costs for the upkeep of the animals. §5-303(c)(1). Whether a payment is a "fine" depends on whether the fine is strictly remedial or whether it is at all punitive. *See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc*., 492 U.S. 257, 275 (1989). The Court has found *in rem* civil forfeitures to be remedial based on two rationales: (1) to remove the instrumentalities or "tools of the crime" from circulation or (2) because assets seized through forfeiture can be used to compensate victims. *See e.g.*, *Austin*, at 621, 113 S. Ct. 2801. In contrast, a payment is punitive in nature when the payment is intended to generate revenue for the government. *Harmelin v. Michigan*, 501 U.S. 957, 978 n.9 (1991) (Scalia, J). The underlying concern is the risk for abuse, misaligned incentives, and the inappropriateness of forcing certain property owners to bear the expense of funding enforcement of the law through fines rather than through legislative taxes or funding increases. *Browning-Ferris Indus*, 492 U.S. at 275.

Payments imposed for the upkeep for animals during the pendency of animal cruelty cases are "fines" and within the scope of the Excessive Fines clause. *See State v. Bybee*, 134 3d 395, 400, 731 N.E.2d 232, 235 (Ohio App. 1999); *State v. Walker*, 3d 114, 129, 841 N.E.2d 376, 388 (Ohio App. 2005) (finding that a court's ordering a criminal defendant who was convicted of cruelty to animals to make payments for the boarding of the animals was a fine within the meaning of the Excessive Fines clause).

Because a rationale of defraying government costs is disfavored to support finding a payment is remedial (*Browning-Ferris Indus*, 492 U.S. at 275), because the statute leaves the payment to the discretion of the court (*Tillman*, 221 F.3d at 420), and because other state courts have found such payments to be fines (*Bybee*, 731 N.E.2d at 235), the fines imposed on Romig should be considered a fine under the Excessive Fines Clause.

### B.  The Fine Imposed on Romig for Upkeep of his Chickens is Excessive

The second issue to determine if the fine imposed on Romig violated the Excessive Fines clause is whether a fine is excessive. Under the principle of "proportionality, [t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321 (1998). Here, the fine imposed on Romig was excessive. Romig would have been required to pay over $14,000 to appeal the administrative hearing. (ECF No. 17, Second. Amed. Compl. ¶ 43). Romig was unable to pay and had to seek a waiver of the costs that was denied by the Board. (*Id*. ¶ 46).

**CONCLUSION**

For the foregoing reasons, Romig respectfully requests this Court to deny Defendants'

Motion to Dismiss pursuant to 12(b)(6) and allow this case to proceed.

Submitted this 26th day of November 2020,

<u>/s/ John M. Shoreman</u>
John Shoreman (#407626)

**McFadden & Shoreman LLC**
1050 Connecticut Avenue NW
Suite 500
Washington, DC 20036
(202) 772-3188/ Fax: (202) 204-8610
Email: jmshoreman@verizon.net
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS,** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all counsel of record,

Submitted this 26th day of November 2021,

<u>/s/ John M. Shoreman</u>
John Shoreman (#407626)

**McFadden & Shoreman LLC**
1050 Connecticut Avenue NW
Suite 500
Washington, DC 20036
(202) 772-3188/ Fax: (202) 204-8610
Email: jmshoreman@verizon.net
*Counsel for Plaintiff*