## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

RAYMOND ROMIG,

Plaintiff,

v.

MONTGOMERY COUNTY,

Defendant.

Civil Action No. TDC-21-1475

## MEMORANDUM OPINION

Plaintiff Raymond Romig filed this civil action pursuant to 42 U.S.C. § 1983 against Defendant Montgomery County, Maryland ("the County") in which he alleges that the County violated his right to due process of law under the Fourteenth Amendment to the United States Constitution and imposed an excessive fine in violation of the Eighth Amendment when it seized 102 chickens from his residence in Burtonsville, Maryland in November 2019. Pending before the Court is the County's Motion to Dismiss, which is fully briefed. Upon review of the pleadings and submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Dismiss will be GRANTED.

## BACKGROUND

### I.    Animal Seizure

On November 18, 2019, Animal Services Officer Angel Ricketts of the Montgomery County Police Department, Animal Service Division ("ASD"), was responding to a call in an area of the County north of Burtonsville, Maryland when she saw rooster cages on another property in the area. That property, located on Bell Road in Burtonsville, was a small farm that belonged to

Romig ("the Property"). When Officer Ricketts asked Romig to allow her to enter the Property, Romig agreed.

Two days later, on November 20, 2019, Officer Ricketts filed an application for a search warrant for the Property pursuant to Montgomery County Code § 5-301(d), which provides that "[a]n animal control officer may enforce an animal control law by searching private property and seizing evidence·or animals, under State law or a warrant issued by a court." Montgomery Cnty., Md., Code ("M.C.C.") ch. 5 § 5-301 (2023). In the application, Officer Ricketts stated that on November 18, 2019, while Romig was showing her where his birds and dogs were kept around the Property, she observed overgrowth and debris littered throughout the perimeter of the Property. She also saw what she considered to be evidence that Romig was raising chickens for breeding purposes and evidence of animal cruelty. Specifically, Officer Ricketts stated that she observed caged and uncaged birds, birds at the rear of the Property without proper shelter, and multiple single cage units housing individual roosters, which Officer Ricketts deemed to be "indicative of the housing used in cock fighting establishments." Second Amended Complaint ("SAC") ¶¶ 24–25, ECF No. 17. According to Romig, however, individuals who raise roosters may use multiple single cage units for reasons other than cockfighting, as roosters are often separated because their natural instinct is to fight if left together.

Officer Ricketts also observed multiple roosters with combs and wattles removed, which she considered to be a practice used only in relation to cockfighting, in order "to protect the birds from injury" during a fight. *Id.* ¶¶ 27–28. According to Officer Ricketts, there is no legitimate agricultural purpose for removing combs and wattles. Romig, however, asserts that the practice of removing combs and wattles, known as "dubbing," is required by the American Poultry Association and the American Bantam Association "in order for chickens to be shown at one of

2

their sponsored events." *Id.* ¶ 29. Romig also claims that dubbing helps to maintain the health of male chickens during the winter.

Officer Ricketts also stated in the application that she observed roosters and hens housed together in pens, which she deemed to be "indicative of breeding establishments." *Id.* ¶ 30. According to Romig, breeding chickens is legal, and he acknowledged that he did so. Specifically, he engages in breeding to preserve "valuable poultry bloodlines" and to protect certain endangered breeds from extinction. *Id.* ¶ 31.

Finally, Officer Ricketts observed multiple trash containers of "high-quality feed" and several bags of "starter feed," which she considered to be indicative of a cockfighting and breeding establishment. *Id.* ¶ 32. Romig asserts that such feed is consistent with that used for any chicken breed and does not provide any extra nutrition that would be relevant to cockfighting.

On November 22, 2019, the ASD executed the search warrant and seized 102 chickens from the Property. According to Romig, the chickens were in demonstrably good health at the time they were seized. The chickens were then placed in the custody and care of the ASD.

That same day, the ASD issued to Romig a written Notice of Impoundment ("the Notice"), signed by ASD Director Thomas J. Koenig, informing Romig of the seizure and of his right to appeal the ASD's determination to impound his animals. Notice at 1, Mot. Dismiss Ex. 1, ECF No. 21-2. Specifically, the Notice stated, "[Y]ou have 5 days to appeal the Director's decision to indefinitely impound the animal(s) to the County's Animal Matters Hearing Board ("the Board")." *Id.* The Notice further stated, "If you do not file an appeal to the Board challenging the indefinite impoundment during the 5-day period for filing an appeal, the Director may proceed to dispose of your animal(s) in any manner authorized by the County's Animal Control law." *Id.* It included a Hearing Application Form through which Romig could request a hearing on his appeal.

Romig was also notified that if he chose to file an appeal, he would be "required to prepay to the County, within five days of this notification . . . the estimated cost of caring for [his] animals for a 30-day period," which the ASD calculated to be $14,000. *Id.*; SAC ¶¶ 43–44. Any failure to pre-pay the costs would "result in the animal(s) being deemed abandoned, at which point the animals(s) becomes the property of Montgomery County." Notice at 2. The Notice stated, however, that the ASD Director could waive or modify the pre-payment requirement "if you provide evidence that prepayment for days of care will be a serious financial hardship." *Id.* The Notice also provided that Romig could appeal the determination of the amount of required pre-payment of costs.

The Notice stated that while animals are in protective custody with ASD, "during any appeal process prior to a Board decision," the animals "would NOT be euthanized unless medically necessary." *Id.* It warned, however, that if "by close of business on November 27, 2019," Romig had not filed an appeal challenging the impoundment decision and had not filed a first monthly pre-payment of boarding costs or filed an appeal of the boarding costs, "then all of your animals . . . will be considered abandoned, and will become the property of Montgomery County." *Id.*

Romig did not file a notice of appeal by November 27, 2019 or make any pre-payment. According to Romig, the Board held a hearing on an unspecified date and approved the seizure. On December 6, 2019, a notice of animal abandonment was issued in relation to Romig's chickens. On December 9, 2019, Romig filed a notice of appeal of the decision to keep the seized chickens and of the determination that the cost of housing the chickens was $14,000. He also requested a waiver of this cost. On January 13, 2020, the Board denied Romig's appeal as untimely. *Romig v. Montgomery Cnty. Dep't., of Police Animal Servs. Division* ("*Romig I*"), No. 478029V, Opinion & Order at 2 (Cir. Ct. Montgomery Cnty. Nov. 3, 2021), ECF No. 22-1.

4

On January 21, 2020, Romig filed a Petition for Judicial Review of the Board's decision with the Circuit Court of Montgomery County, Maryland ("the Circuit Court"). Romig also requested that the Circuit Court bar the County from taking any action that would harm his chickens until after a hearing. However, during December 2019 and January 2020, almost all of Romig's chickens either died due to starvation or were euthanized by the County.

On June 11, 2021, while Romig's Petition for Judicial Review was still pending in the Circuit Court, Romig filed the original Complaint in the present action alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983.

On November 3, 2021, the Circuit Court dismissed Romig's Petition on the grounds that the Board correctly denied Romig's appeal as untimely, as it was filed 13 days after the deadline, and that it was moot because the chickens had already been euthanized. *Romig I*, No. 478029V, Opinion & Order at 8.

## II.    Criminal Charges

Meanwhile, on November 21, 2019, Romig was criminally charged with ten counts of aggravated cruelty to animals, in violation of Md. Code Ann, Crim. Law § 10-606 (LexisNexis 2021), 10 counts of animal cruelty based on cockfighting, in violation of Md. Code Ann., Crim. Law § 10-608 ("Section 10-608"), and two counts of possessing implements of cockfighting, in violation of Section 10-608. *State v. Romig*, No. 2D00405092 (Montgomery Cnty. Dist. Ct. 2019), *available at* https://casesearch.courts.state.md.us (last visited Mar. 30, 2023). Romig ultimately entered into a plea agreement and pleaded guilty in the Circuit Court for Montgomery County in October 2020 to one count of conspiracy to possess cockfighting implements under Section 10-608. As part of the plea agreement, Romig was permitted to retain the hens already living on the

Property if he followed an agreement relating to their care, but he agreed not to own any roosters for a two year period, until October 2022.

## III.   The Complaint

In the presently operative Second Amended Complaint, Romig alleges, in Counts 1 and 2, violations of his Fourteenth Amendment right to due process of law based on his assertions that (1) Md. Code Ann., Crim. Law § 10-615(b)(1) ("Section 10-615(b)(1)"), which authorizes animal control officers to seize animals to protect them from animal cruelty, and Md. Code Ann., Crim. Law § 10-606(b) ("Section 10-606(b)"), which criminalizes aggravated cruelty to animals, are void for vagueness because the definition of animal cruelty fails to place an individual on notice of what conduct is prohibited or to sufficiently limit an officer's discretion; (2) Section 10-615(b)(1) and Montgomery County Code ch. 5 § 5-301 ("M.C.C. Section 5-301") permit the seizure and euthanization of animals without first providing a hearing; and (3) there is no requirement that a veterinarian make a determination of animal cruelty before animals may be seized.  In Count 3, he alleges that the County's requirement that an animal owner pay the cost of animal care during the pendency of an appeal before the Board violates the Excessive Fines Clause of the Eighth Amendment.  As relief, Romig seeks compensatory damages, a declaratory judgment that the above-referenced sections of the Maryland Code and the Montgomery County Code violate the Fourteenth and Eighth Amendments, an injunction against the County's enforcement of these provisions, and attorney's fees and costs.

## DISCUSSION

In its Motion to Dismiss, the County seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that (1) Romig lacks standing to assert claims for prospective relief; (2) Romig fails to state a valid claim against the County for municipal liability

because he has not properly alleged a custom or policy that violated his rights; (3) Romig otherwise fails to state a valid claim for a violation of due process; (4) Romig fails to state a valid Eighth Amendment claim; and (5) injunctive and declaratory relief are unavailable.

**I.      Legal Standards**

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to establish subject matter jurisdiction. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192. The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the

complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Here, Defendants have submitted exhibits with their Motion. Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any documents attached to that pleading. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Courts may also consider facts and documents subject to judicial notice, including "relevant facts obtained from the public record," such as facts from filings in court proceedings. *See Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

Here, the County's exhibits include the Notice issued to Romig on November 22, 2019, the Circuit Court's Opinion and Order on Romig's Petition, and the transcript of the plea and sentencing hearing in Romig's criminal case in the Circuit Court. Because the Notice is specifically referenced in and integral to the Complaint, and Romig does not contest its authenticity, the Court may consider it. The Court will take judicial notice of the remaining two documents and other facts from the relevant court proceedings.

## II. Standing

The County argues that Romig's claims for injunctive relief should be dismissed for lack of subject matter jurisdiction because he lacks standing to seek such relief. Article III of the

8

Constitution limits federal court jurisdiction to certain "Cases" and "Controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct . . . and (3) that is likely to be redressed by a favorable judicial decision." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). The party invoking federal jurisdiction bears the burden of establishing these elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

An injury in fact is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Kenny*, 885 F.3d at 287 (quoting *Susan v. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Plaintiffs can satisfy the injury-in-fact requirement by alleging that they have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* at 288 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A plaintiff need not first incur exposure to "actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id.* The court can find a credible threat of future enforcement "so long as the threat is not imaginary or wholly speculative." *Id.* (quoting *Babbitt*, 442 U.S. at 302). "Past enforcement against the same conduct is good evidence that the threat of enforcement" is real, and the "threat of prosecution is especially credible when defendants have not disavowed enforcement if plaintiffs engage in similar conduct in the future." *Id.*

In *Kenny*, public school students brought a § 1983 class action requesting a declaratory judgment that South Carolina laws against disturbing schools and disorderly conduct were

unconstitutionally vague and requested an injunction against their enforcement. *Id.* at 280. In finding that some of the students had standing to challenge the law, the United States Court of Appeals for the Fourth Circuit found that three of the plaintiffs regularly attended the schools where they alleged there could be future encounters with enforcement officers, that the students had been prosecuted under the laws in the past, and that defendants had not disavowed future enforcement. *Id.* at 289. In particular, the court noted that the students specifically alleged that there would be future encounters with officers at the school, that the statutes authorized the defendants to violate their rights to due process and free speech, and that they feared that their actions would be interpreted as violating these statutes. *Id.* at 288, 290.

Similarly, Romig has previously been subjected to the enforcement of the laws he is challenging. The County seized chickens from Romig pursuant to provisions of the Maryland Criminal Code and the Montgomery County Code that prohibit cruelty to animals and activities relating to cockfighting, prosecuted him for aggravated cruelty to animals in the form of possessing instruments of cockfighting, and euthanized his chickens. Md. Code Ann., Crim. Law §§ 10-606, 10-608, 10-615(b)(1); M.C.C. ch. 5 § 301(c)(2). He is challenging the constitutionality of these provisions in relation to the definition of cruelty, the lack of a hearing before animals can be euthanized, and the lack of a requirement that a veterinarian assess animal cruelty before seizure. Notably, he continues to live in the County, and he asserts that he continues to own animals and is at risk that his remaining animals will again be seized from him in the future in a similar manner, allegedly in violation of his due process rights. Because Romig has been the subject of enforcement of these statutes previously, and has made clear his intention to own animals again, there is a "credible threat of future enforcement" sufficient for this Court to find an imminent injury that is not "hypothetical" or "conjectural." *See Kenny*, 885 F.3d at 287–88.

10

The County nevertheless argues that no injury is imminent because, pursuant to his plea agreement in his criminal case, he was not permitted to own roosters for two years. However, it is undisputed that Romig had hens in his possession at the time of the plea agreement and was permitted to retain them, and he has stated that he intends to own more animals in the future. Even with the prohibition on roosters, Romig's concerns about the alleged vagueness of the statutory definition of "cruelty," and the potential euthanization of animals without a hearing, would be implicated by enforcement of these provisions as to other animals he may possess at the Property. Notably, Officer Ricketts found the Property to have general conditions, such as overgrowth, debris, and inadequate shelter, that she deemed indicative of cruelty. SAC ¶¶ 24–25. Finally, Romig was permitted to have some roosters on the Property again as of October 2022, only one year after the filing of the Second Amended Complaint. The Court therefore finds that Romig has sufficiently alleged "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Accordingly, Romig has standing to advance his claims for injunctive relief.

### III.  Municipal Liability

The County also argues that Romig has failed to allege viable claims against the County because he has not asserted facts that satisfy the requirements for municipal liability on a § 1983 claim. A local government may be sued under § 1983 only when "execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible [for] under § 1983." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Thus, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality

11

and that proximately caused the deprivation of their rights." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir.1994)). A custom or policy for which a municipality may be held liable can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a custom or usage with the force of law.

*Lytle*, 326 F.3d at 471 (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir.1999)). As to the first category, an express policy may consist of "formal rules or understandings" that "are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Semple*, 195 F.3d at 712 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). As to the second, a "single decision regarding a course of action in response to particular circumstances" can constitute an official policy "when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Id.* Such a "final policymaker" is someone who has "the responsibility and authority to implement final municipal policy with respect to a particular course of action." *Lytle*, 326 F.3d at 472 (quoting *Riddick v. School Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). An official is not a final policymaker if that official's decisions are subject to further review by higher authorities within the local government. *See Hunter v. Town of Mocksville*, 897 F.3d 538, 555 (4th Cir. 2018). In *Hunter*, a case in which three police officers alleged that their termination violated their free speech rights under the First Amendment, the Fourth Circuit found that the town manager was a final policymaker for purposes of her decision to terminate the plaintiffs because "the Town Board chose to confer on [the town manager] unfettered final policymaking authority with respect to almost all personnel matters—including terminations." *Id.* at 561.

Here, Romig does not claim that the Board's actions against him were conducted pursuant to an express policy. Rather, he argues that the Board's action, which in this case consisted of the denial of his appeal, qualifies as an official policy action because the Board had "final policymaking authority" to make decisions on behalf of the County. Opp'n Mot. Dismiss at 13, ECF No. 23. Under the Montgomery County Code, the Board, along with the ASD Director and animal control officers, has the authority to make decisions relating to the enforcement of animal control laws, including by issuing a written order providing the factual and legal basis for an order issued by the Director or an animal control officer. M.C.C. ch. 5 § 5-301(a)-(b). The same provision also gives the Board the authority to destroy animals in certain situations. *Id.* § 5-301(b)(2)(A)–(C). When an animal is seized from an individual, the Board is the final authority in the County government before the individual must file an appeal to the state judicial system. *Id.* § 5-307. Here, although the seizure was conducted by an ASD animal control officer, the Board's decision to deny Romig's appeal as untimely, which effectively barred any challenge to the earlier actions by County officials, could be construed as the final decision within the County government on what would happen to Romig's chickens. Thus, even if the Board's actions relating to Romig's chickens do not constitute the exercise of a broad policy, they could fairly be viewed as constituting a "single decision regarding a course of action in response to particular circumstances" made by a final policymaking authority that can subject the County to municipal liability. *See Semple*, 195 F.3d at 712.

## IV.   Due Process

The County further argues that Romig has failed to state plausible claims that its policies or actions violate Romig's Fourteenth Amendment right to due process of law. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without

due process of law[.]" U.S. Const. amend. XIV § 1.  Construed liberally, the Second Amended Complaint alleges three due process violations:  (1)  that Sections 10-615(b)(1) and 10-606(b) are unconstitutionally void for vagueness because the definitions of animal cruelty do not provide fair notice of what conduct is prohibited; (2) that the euthanization of animals without a hearing violates due process; and (3) that the statutes' failure to require that a veterinarian determine whether an animal is being cruelly treated before officers may seize the animal does not comport with due process.  SAC at 12.  The Court construes Count 2 to assert facial challenges to these provisions and Count 1 to assert an as-applied challenge relating to the specific enforcement of these provisions against Romig.

A facial challenge asserts that a statute is invalid as written when measured against a substantive constitutional doctrine, rather than against the facts of a particular case.  *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015).  For such a challenge, the plaintiff must demonstrate that "no set of circumstances exist under which the [provision] would be valid."  *Reno v. Flores*, 507 U.S. 292, 300 (1993).  An as applied challenge asserts that the provision is unconstitutional based on the "application of a statute to a specific person."  *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013).

### A.    Vagueness

Romig argues that Sections 10-615(b)(1) and 10-606(b) are unconstitutionally vague, specifically, the term "cruelty."  A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  Under this standard, "perfect clarity and precise guidance have never been required."  *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019) (citation omitted).

Section 10-615, entitled "Care of mistreated animal," includes Section 10-615(b)(1), which provides that: "[a]n officer or authorized agent of a humane society, or a police officer or other public official required to protect animals may seize an animal if necessary to protect the animal from cruelty." Md. Code Ann., Crim. Law § 10-615(b)(1). Section 10-606, entitled "Aggravated cruelty to animals—In general," provides that "[a] person may not: (1) intentionally: (i) mutilate an animal; (ii) torture an animal; (iii) cruelly beat an animal; (iv) cruelly kill an animal; or (v) engage in sexual contact with an animal; (2) cause, procure, or authorize an act prohibited under item (1) of this subsection; or (3) except in the case of self-defense, intentionally inflict bodily harm, permanent disability, or death on an animal owned or used by a law enforcement unit. Md. Code Ann., Crim. Law § 10-606. Section 10-601, which applies to both provisions, defines an "animal" as "a living creature except a human being." *Id.* § 10-601(b). It defines "cruelty" as "the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect" and also states that cruelty "includes torture and torment." Md. Code Ann., Crim. Law § 10-601(c).

Romig argues that the definition of "cruelty" in Section 10-601(b) is unconstitutionally vague in that, as used in Section 10-615(b)(1), individuals do not have fair notice of what conduct would provide a basis for seizure of their animals for the purpose of protecting them "from cruelty." *Id.* § 10-615(b)(1). He provides, however, no specific argument that the term "the unnecessary or unjustifiable physical pain or suffering" is not readily understood by "a person of ordinary intelligence." *See Williams*, 553 U.S. at 304; *United States v. Elshinaway*, 228 F. Supp. 3d 520, 532 (D. Md. 2016). Rather Maryland courts considering the term "cruelty" have not found the definition to be unconstitutionally vague. *See In re William G.*, 447 A.2d 493, 495-96 (Md. Ct. Spec. App. 1982) (finding that the Maryland animal cruelty statute, including the

definition of "cruelty," was not unconstitutionally vague); *see also Bowers v. State*, 389 A.2d 341, 348 (Md. 1978) (finding, in considering child abuse statutes, that the term "cruel" has "a settled and commonly understood meaning" and has "acquired a relatively widely accepted connotation in the law").

Even if it were not sufficiently clear, additional provisions within the same subtitle, entitled "Crimes Relating to Animals," provide further detail on the term "cruelty." Section 10-606, which Romig also challenges, actually provides a list of specific conduct constituting "aggravated cruelty," which includes intentionally mutilating, torturing, or engaging in sexual contact with an animal. Md. Code Ann., Crim. Law § 10-606(b)(1). Further, Sections 10-607 and 10-608 provide additional examples of conduct constituting "aggravated cruelty," including activities relating to dogfighting and cockfighting, such as using or allowing "a fowl, cock, or other bird to fight with another animal." *Id.* § 10-608(b)(1). Where the term "cruelty" as used in Section 10-615(b)(1) has a specific definition and includes numerous examples of conduct deemed to constitute cruelty under the statute, the Court finds that Romig has not stated a plausible claim that Sections 10-615(b)(1) and 10-606(b)(1) are facially void for vagueness based on an inadequate definition of the term "cruelty."

Likewise, Romig has not stated a plausible as-applied challenge because in his case, his chickens were seized based on indicators that he was maintaining and using the roosters for cockfighting, a concern that was confirmed when Romig later pleaded guilty to the crime of conspiracy to possess cockfighting implements based on the events in question and received a probation before judgment disposition. Hrg. Tr. at 4, 11, Mot. Dismiss Ex. 2, ECF No. 21-3. Where Section 10-608 specifically identifies "aggravated cruelty" as including possession of

16

cockfighting implements, Md. Code Ann., Crim. Law § 10-608(b), Romig has not stated a viable claim that the term "cruelty" was unconstitutionally vague under the circumstances of his case.

Given that the relevant statutes provide sufficient notice to both an enforcement officer and to a defendant as to what is prohibited, and did so during the actual seizure of Romig's chickens, the Maryland statutes at issue are not unconstitutionally vague on their face or as applied to Romig.

## B. Procedural Due Process

Romig next claims that his procedural due process rights were violated when the County seized his chickens and later euthanized them without a hearing, either before or after the seizure. He also argues that the procedures were inadequate because no veterinarian was required to or did make a finding that his chickens were subjected to cruelty before they were seized.

A procedural due process claim may exist where there had been a deprivation of a protected liberty or property interest by state action. *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson,* 566 F.3d 138, 146 (4th Cir. 2009). The parties agree that Romig had a property interest in his animals. "A person may possess a property interest in an animal, but that [] property interest in an animal is of a qualified nature subject to the legitimate exercise of the State's police powers." *Bogart v. Chapell,* 396 F.3d 548, 556 (4th Cir. 2005). As for what procedures must be provided before a person may be deprived of a property interest, the core protections of due process are notice and an opportunity to be heard. *See Fuentes v. Shevin,* 407 U.S. 67, 80 (1972); *see also Bogart,* 396 F.3d at 556 (stating that the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner"). "Notice is constitutionally adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Snider Int'l Corp. v. Town of Forest Heights,* 906 F. Supp. 2d 413, 431 (D. Md. 2012)

(quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), *aff'd*, 739 F.3d 140 (4th Cir. 2014). The Due Process Clause "is flexible and calls for such procedural protections as the particular situation demands," because "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In determining what procedural protections are due, courts must consider: (1) the private interest affected by the deprivation; (2) the risk of an erroneous deprivation through the procedures which were used and the probable value, if any of additional or substitute safeguards; and (3) the government's interest, including in avoiding the burdens associated with substitute or additional procedures. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

In the Complaint, Romig primarily asserts that Section 10-615(b)(1) and M.C.C. Section 5-301 violate procedural due process because they permit the seizure and euthanization of animals without a hearing. These statutes, however, provide the opportunity for a hearing before any such euthanization. When a seizure or other enforcement action occurs, the ASD Director or an animal control officer must "must notify the animal owner of the seizure." M.C.C. ch. 5 § 5-306(a). Specifically, the County must provide a Notice of Impoundment that informs the animal owner of the applicable requirements, which include the need to file a notice of an appeal to the Board within five days after receiving notice of the seizure decision. *Id.* §§ 5-303(b), 5-306(a). After an animal owner receives a Notice of Impoundment, the owner may appeal the seizure and request a hearing. *Id.* § 5-302(a)(2). Notably, the County "must not dispose of the animal during the 5-day period for filing an appeal, or while an appeal is pending, unless authorized to do so" by another part of the statute. *Id.* § 5-306(a). If the Board rules against the animal owner at the hearing, the owner may appeal the order to the Circuit Court for Montgomery County. *Id.* § 5-307. However, if the animal owner fails to file a notice of appeal within the five-day period, the animal owner is deemed

to have "abandoned and forfeited to the County any animal that is the subject of the order." *Id.* § 5-301(c)(2)(C), (f).

As part of this process, to pursue an appeal, the animal owner "[m]ust pay any boarding costs for the animal before and during any appeals," or instead post a bond if allowed by the Board, *id.* § 5-306(f), but the owner may seek a waiver from pre-payment of the costs based on financial hardship, *id.* §§ 5-303(7), 5-306(e), or seek review of the calculation of boarding costs by filing an appeal with the Chief Administrative Officer of the Board. *Id.* § 5-306(e). The animal owner could then appeal the decisions on these issues to the Board. *Id.* If the animal owner fails to pre-pay boarding costs or file such an appeal, however, "the animal must be treated as abandoned and becomes the County's property." *Id.* § 5-301(g).

Considered in their entirety, these procedures provide for notice of a seizure and an opportunity to be heard before any disposal of a seized animal.

In the Second Amended Complaint, Romig identifies certain alleged procedural deficiencies that he claims to violate due process. First, he asserts that Sections 10-615(b)(1) and 10-606(b) violate due process because they do not require that a veterinarian determine whether an animal is being treated cruelly before any seizure. Of these two statutory sections, only Section 10-615(b)(1) specifically addresses the seizure of animals, and it permits an "officer or authorized agent of a humane society, or a police officer or other public official required to protect animals" to seize an animal "if necessary to protect the animal from cruelty." Md. Code Ann., Crim. Law § 10-615(b)(1). The officers who seized Romig's animals were ASD officers and thus meet the requirement of "public official required to protect animals." *Id.* Romig provides no legal authority to support his contention that due process would require a veterinarian to inspect animals for evidence of cruelty prior to their seizure. Indeed, the need for a veterinarian to made a medical

19

determination is not clear where the statutory definition of animal cruelty or "aggravated cruelty" includes conduct such as mutilating animals, possessing implements of cockfighting, and possessing a bird with the intent to use it in a cockfight, violations that could ordinarily be identified without a medical determination. *See* Md. Code Ann., Crim. Law §§ 10-606(b), 10-608. Romig has therefore failed plausibly to allege that the statute facially violates due process. As for his as-applied challenge, where an ASD official conducted the seizure, and the basis for seizure included possessing cockfighting implements or possession of a bird with the intent to use it in a cockfight, there is no basis to conclude that the failure to have a veterinarian inspect the chickens before their seizure violated due process. Accordingly, Romig's due process claim based on the lack of a veterinarian requirement fails.

Second, Romig argues that the procedures are deficient because there was neither a pre-seizure nor a post-seizure hearing before he was deprived of the chickens. As for a pre-seizure hearing, it is not always necessary to have a hearing before a deprivation of a property interest. *See Parratt v. Taylor*, 451 U.S. 527, 540 (1981); *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988). Considering the *Mathews* factors, though animal owners have a clear property interest in their animals, and the absence of a pre-seizure hearing may present some risk of an erroneous deprivation, under the Montgomery County Code, a seizure would be conducted by an animal control officer, not a general police officer, and an entry to private property would ordinarily be pursuant to a search warrant issued by a court, so the officer would not be acting without any oversight. *See* M.C.C. ch. 5 § 5-301(d); *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 486 (6th Cir. 2014) (holding that the risk of an erroneous deprivation was low where animals were assessed pre-seizure by trained animal-welfare officers). Where the seizures in question are of live animals which may be subjected to cruelty, courts have recognized the strong governmental

interest in protecting animals believed to be subjected to such cruelty or other harms. *See United Pet Supply, Inc.*, 768 F.3d at 487 (in upholding a seizure of animals without a prior hearing, noting the strong governmental interest in removing animals from a hot, filthy environment); *see also United States v. Stevens*, 559 U.S. 460, 469 (2010) (noting that "prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies"). *Cf. Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) (stating that "the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child"). The government's interest in being able to take action swiftly to stop such cruelty would be undermined by a pre-seizure hearing requirement. Accordingly, the Court finds no due process violation arising from the lack of a pre-seizure hearing. *See United Pet Supply, Inc.*, 768 F.3d at 487 (concluding that there was no violation of due process from the seizure of animals without a prior hearing where the "risk of an erroneous deprivation" was low and there was "minimal value of additional safeguards," as compared to "the great governmental interest in immediately removing the animals from an overly hot, filthy environment," particularly given the fact that a hearing was provided nine days later).

As for post-seizure, Romig does not dispute that a hearing would have been available had Romig filed a timely notice of appeal. Instead, he asserts in his brief new due process claims not alleged in the Second Amended Complaint: that the five-day deadline to file a notice of appeal violates due process, and that the requirement to pre-pay the costs of care did not comport with due process. Because a plaintiff may not amend the complaint through a brief on a dispositive motion, these additional claims do not provide a basis to preclude dismissal. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the

21

allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Even if the Court could consider these additional claims, Romig has not stated viable claims for relief. As to the five-day period, while the short time period creates a higher risk of erroneous deprivation, the risk is limited because the burden on the animal owner to preserve appeal rights is minimal: the animal owner need only file a notice of appeal within five days, not submit any evidence or legal argument. Similarly, while an animal owner must pre-pay the costs of care in order to pursue an appeal, because the procedures allow an animal owner to appeal the calculation of the cost of care and to seek a waiver of the filing fee and prepayment of costs of care based on financial hardship, the risk of an erroneous deprivation arising from the payment requirement is diminished. M.C.C. ch. 5 §§ 5-306(c), 5-306(e). Once the government has seized live animals, however, it has a strong interest in a prompt determination of whether the seizure will be contested and moving to resolution expeditiously because it is responsible for the care and feeding of the animals. For the same reason, the government has a strong interest in being able to have the animal owner, if it seeks to maintain ownership over the animals, pay the costs of care. Balancing these factors, the Court finds that Romig has not plausibly alleged that the County's procedures relating to providing a hearing before any permanent deprivation of animals were facially unconstitutional as a matter of procedural due process.

Beyond a facial challenge, Romig's as-applied challenge fails under the facts presented in the Second Amended Complaint. First, Romig does not dispute that he received notice of the seizure and his right to a hearing. Upon seizing Romig's chickens on November 22, 2019, the ASD provided Romig with the Notice specifically informing him of the seizure and notifying him that he had five days to file an appeal and to request a hearing on the decision to impound the

animals by filing the Hearing Application Form.  It also notified Romig that if he failed to file an

appeal, the animals would become the property of the County, and the ASD Director could proceed

to dispose of the animal in any manner authorized by the County law.   Where it is undisputed that

Romig failed to file an appeal within the time frame identified by the Notice, he cannot claim that

he did not have notice or an opportunity to be heard. *See Snider*, 906 F. Supp. 2d at 431 (stating

that where plaintiffs received notice by mail of their right to contest liability on traffic violations,

"[p]laintiffs who declined to avail themselves of their opportunity to appear have suffered no injury

and therefore fail to state a claim upon which this court may grant relief" based on procedural due

process).

Although Romig argues that the five-day time limit to file an appeal was particularly unfair

to him in light of his pending criminal case, where all that was required was the filing of a notice

of appeal by completing the Hearing Application Form which required him only to check a box to

invoke his right to appeal, not to file a brief or other lengthy submission, the allegations in the

Complaint do not demonstrate how in his particular situation, the established procedures could not

be completed even with a pending criminal case.  Furthermore, the fact that Romig did not merely

miss the deadline by one or two days, but instead did not file his notice of appeal until 18 days

after he received notice—almost two weeks after the deadline—illustrates that the procedures as

applied to Romig did not violate due process.

Finally, to the extent that Romig makes additional due process claims in his brief, including

(1) that M.C.C. Sections 5-301(c)(1) and 5-301(c)(7) do not permit the costs for boarding animals

to be meaningfully challenged; and (2) that M.C.C. Section 5-301 limits the rights of animal

owners to direct the care and feeding of their animals, these claims are even further afield from the

allegations in the Second Amended Complaint and will not be considered because Romig cannot

amend his complaint through his brief on the Motion. *See Zachair Ltd.*, 965 F. Supp. at 748 n.4. The Court will therefore dismiss the due process claims in Counts 1 and 2.

## V.  Excessive Fines Clause

In Count 3, Romig asserts that the requirement that an animal owner must pay the costs of care for seized animals during the pendency of a civil or criminal enforcement action violates the Excessive Fines Clause of the Eighth Amendment, which provides that "[e]xcessive bail shall not be required, nor excessive fines imposed[.]" U.S. Const., amend. VIII. The Excessive Fines Clause thus "prohibits the government from imposing excessive fines as punishment." *Korangy v. U.S. Food & Drug Admin.*, 498 F.3d 272, 277 (4th Cir. 2007). "While Eighth Amendment claims often arise in the criminal context, civil sanctions may fall within the scope of the amendment." *Id.*

"[A]t the time the Constitution was adopted, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 327 (1998) (quoting *Browning-Ferris*, 492 U.S. 257, 265 (1989)). Thus, the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *Id.* at 328 (quoting *Austin v. United States*, 509 U.S. 602, 609– 610 (1993)). Accordingly, civil fines "serving remedial purposes do not fall within the reach of the Eighth Amendment." *Korangy*, 498 F.3d at 277. A remedial purpose can include compensation to the government for a loss. *Bajakajian*, 524 U.S. at 329. However, if a civil sanction "can only be explained as serving in part to punish," then it is subject to the Excessive Fines Clause. *Korangy*, 498 F.3d at 277 (quoting *Austin*, 509 U.S. at 610).

Here, the County requires that once animals are seized, the owner has to "prepay to the County ... the estimated cost of caring for [the] animals." Notice at 1. On its face, the required

24

2e284e17688a4d4b

payment was not a fine but was instead a remedial action to cover the costs of care for an individual's animals.    Any claim that this pre-payment requirement constituted a form of punishment is further undermined by the fact that, as stated in the Notice, an individual can seek a waiver of the pre-payment of costs due to financial hardship or can seek a review of the calculation or "determination of boarding costs," *id.* at 2, which provides further evidence that the proposed payment was not a fine to be paid as punishment, but a remedial payment designed to compensate the County for costs incurred in caring for animals.  Accordingly, Romig's claim that this payment was a fine subject to, and in violation of, the Excessive Fines Clause fails.  This claim will therefore be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss will be GRANTED.  A separate Order shall issue.

Date:   March 31, 2023

THEODORE D. CHUANG
United States District Judge